IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**ENTERED**

BLUEFIELD DIVISION

APR 2 9 2005

TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

RAYNARD L. McKINNEY,　　　　　)
　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　)　　　　CIVIL ACTION NO. 1:04-0300
　　　　　　　　　　　　　　　)
JO ANNE BARNHART,　　　　　　 )
Commissioner of Social Security,　)
　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　)

## M E M O R A N D U M　O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's Application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401 - 433. This case is presently pending before the Court on Plaintiff's

Motion to Consolidate Action (Document No. 13) which Defendant opposes (Document No. 17.)[1]

---

[1] Plaintiff moves to consolidate this action and a prior action, Civil Action No. 1:02-0473, which he initiated requesting review of the Commissioner's unfavorable decision respecting the same application for benefits which is the subject of this case "[b]ecause these cases are inextricable . . .." (Document No. 13.) The Court granted Defendant's Motion to Remand in Civil Action No. 1:02-0473 pursuant to sentence four of 42 U.S.C. § 405(g) on November 18, 2002. Thus, the Defendant's decision under review in Civil Action No. 1:02-0473 was vacated or reversed. Defendant has opposed consolidation asserting that "no other active civil action exists which can be consolidated with this action." (Document No. 17, p. 1.) Defendant further points out that certain documents which Plaintiff indicates are missing from the transcript in this case and were in the transcript in Civil Action No. 1:02-0473 are actually in the transcript in this case. The Court finds that the transcript in this case does indeed contain the documents which Plaintiff indicates are missing in Schedule A attached to his Memorandum in Support of his Motion for Judgment on the Pleadings. Looking to Rule 42(a) of the Federal Rules of Civil Procedure, the Court views its power to consolidate as discretionary and focused upon promoting judicial economy. Rule 42(a) provides that consolidation is appropriate "[w]hen actions involving a common question of law or fact are pending before the court . . .." The Court finds consolidation unnecessary in this case. Civil Action No. 1:02-0473 was remanded and is therefore not pending, and the record in this case contains all of the relevant documents which were in the record in that case. As a practical matter, the Court can conceive of no way judicial economy might be served

and Plaintiff's Motion for Judgment on the Pleadings (Document No. 14.) and Defendant's Motion for Judgment on the Pleadings (Document No. 20.). Additionally, Plaintiff filed a Response to Defendant's Memorandum in Support of her Motion for Judgment on the Pleadings (Document No. 23.), and the Court has considered it. Both parties have consented in writing to a decision by the United States Magistrate Judge.

The Plaintiff, Raynard L. McKinney (hereinafter referred to as "Claimant"), initially filed an Application for DIB on August 15, 2000, alleging disability as of June 1, 1997, due to "[a]rthritis in right shoulder, shortness of breath, back pain, migraines, difficulty controlling bowel function." (Tr. at 51 - 53, 60.) Claimant also stated that he has poor eyesight having had cataract surgery on his right eye and being legally blind in his left eye. (Tr. at 60.) The claim was denied initially (Tr. at 28 - 30.) and upon reconsideration (Tr. at 37 - 39.) Claimant requested a hearing before an Administrative Law Judge [ALJ] (Tr. at 40 - 41.), and a hearing was held before Administrative Law Judge Thomas W. Kennedy on February 1, 2002. (Tr. at 158 - 183.) By Decision dated February 22, 2002, Judge Kennedy found that Claimant was not entitled to benefits. Claimant requested that the Appeals Council review the ALJ's decision (Tr. at 10.), and on May 10, 2002, the Appeals Council found no basis for granting Claimant's request (Tr. at 7 - 8.). On May 22, 2002, Claimant filed a Complaint in this Court seeking review of the Commissioner's decision, and his action was designated Civil Action No. 1:02-0473. The Commissioner answered and filed a transcript of the administrative record, and Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support. On November 18, 2002, the Commissioner filed a Motion to Remand, and that same day, the District

---

and no prejudice which might befall Plaintiff as a consequence of the denial of his motion, and the Court will therefore deny it.

Court entered an Order remanding the matter to the Commissioner. On February 11, 2003, the Appeals Council remanded the case to the ALJ for "a consistent articulation of the claimant's residual functional capacity." (Tr. at 205 - 207.) ALJ Kennedy held a further hearing on June 17, 2003. (Tr. at 343 - 382.) On August 20, 2003, ALJ Kennedy issued a partially favorable Decision. (Tr. at 186 - 197.) It appears that Claimant requested an extension of time within which to submit objections to the ALJ's decision to the Appeals Council, and the Appeals Council denied his request on February 5, 2004. (Tr. at 184 - 185.) The Appeals Council advised that Claimant had sixty days to seek judicial review of the Commissioner's final decision, and Claimant brought the present action on March 29, 2004, seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (1999). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations

3

No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (1999). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant met the non-disability requirements for a period of disability and Disability Insurance Benefits on June 1, 1997, and was last insured for benefits on December 31, 2000. (Tr. at 195, Findings No. 1.) The ALJ further determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of June 1, 1997. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of "traumatic and degenerative joint disease; blind left eye and weak vision in right eye; chronic obstructive pulmonary disease; untreated hypertension; pedal edema; chronic depression; anxiety; and past history of alcohol abuse, a combination of impairments considered 'severe' . . .." (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Id., Finding No. 4.) The ALJ stated specifically respecting Claimant depression that

4

"[h]is depression has resulted in no more than mild limitations in personal activities; moderate limitations in his social activities; moderate limitations in his ability to concentrate; and there is no indication of decompensation in work settings due to mental impairments." (Id.) The ALJ then found that Claimant "had a residual functional capacity to perform unskilled sedentary exertional activity prior to December 24, 2001, subject to perform unskilled sedentary exertional activity, subject to limited visual acuity; limited reaching with the right arm; and various postural and respiratory limitations. These postural limitations would restrict the frequency of bending, stooping, squatting, crawling, kneeling and crouching. These respiratory limitations would restrict the claimant from working around fumes, dust, high humidity, or stale air." (Id., Finding No. 7.) Thus, the ALJ concluded that Claimant "had the residual functional capacity to perform a significant range of unskilled sedentary work prior to attaining the age of fifty on December 24, 2001; thereafter he lost this ability. (Tr. at 196, Finding No. 12.) The ALJ found that Claimant could not perform any of his past relevant work. (Tr. at 195, Finding No. 8.) Nevertheless, though Claimant's exertional limitations did not allow him to perform the full range of unskilled sedentary work as the ALJ found, the ALJ concluded on the basis of vocational expert testimony that prior to December 24, 2001, Claimant could perform jobs at the sedentary exertional level existing in the regional and national economies such as bench work assembler and general assembler. (Tr. at 196, Finding No. 14.) On this basis, the ALJ found that Claimant was not under a disability at any time prior to December 24, 2001, and benefits were denied. (Tr. at 26.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640,

642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence.  Hays v.Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the decision of the Commissioner in this case is

in conformity with all applicable legal standards and supported by substantial evidence.

Claimant's Background

Claimant was born on December 25, 1951, and was 51 years old at the time of the second

administrative hearing (June 17, 2003). (Tr. at 51, 346.) Claimant has a sixth grade education. (Tr.

at 160, 346.)  In the past, he worked as a pipe layer, equipment operator, construction and

maintenance worker and vehicle mechanic.  (Tr. at 61, 67, 163 - 167.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence of record, and

will discuss it further below as necessary.

Claimant's Challenges to the Commissioner's Decision and the Commissioner's Response

Claimant essentially contends that "the Administrative Law Judge erred in his assessment

of employability between August 15, 1999 (one year prior to the filing of his application, i.e., the earliest date on which he could be found disabled) and December 23, 2001." (Document No. 15, p. 4.) Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ "erred at step 5 when he found plaintiff capable of engaging in work activity prior to December 24, 2001." (Id., p. 7.) Claimant asserts that the limitations resulting from his musculoskeletal and visual impairments preclude employment and his remaining impairments affect his employability. (Id., p. 8.) Claimant further contends that the ALJ's statement respecting his credibility is "unfair and contrary to the hearing evidence." (Id., p. 14.) Referring to Exhibit 8-F as the residual functional capacity of his treating physician, Dr. Khosla, Claimant states that the ALJ further erred because "despite the Administrative Law Judge's total acceptance at the hearing of Dr. Khosla's residual functional capacity assessment, in his Decision he stated it was untrustworthy." (Id., p. 15.) Claimant states that the assessment "was endorsed by Dr. Wile" who testified as a medical expert at the administrative hearing. (Id., p. 16.) Claimant thus takes the position that the ALJ erred in rejecting Dr. Khosla's assessment. (Id., p. 17.)

The Commissioner contends in response that substantial evidence supports the ALJ's determination that Claimant could perform the work identified by the vocational expert notwithstanding the limitations resulting from his impairments as specified by his treating physicians. (Document No. 21.) The Commissioner claims specifically that no objective medical evidence or medical or vocational expert testimony indicated that Claimant's visual impairments prevented him from performing the work identified by the vocational expert. (Id., pp. 8 - 9.) The Commissioner further claims that "the objective medical evidence from the relevant period does not indicate that any doctor, including Plaintiff's treating physician, opined that Plaintiff had difficulty

reaching to the side." (Id., p. 9.) Additionally, the Commissioner states that the ALJ adopted the functional capacity assessment including the standing and sitting limitations as Dr. Khosla found them. (Id., pp. 10 - 11.) The Commissioner notes that the record contains two Exhibit 8-Fs, one being Bluestone Health Center treatment notes as they were contained in the record prior to the case's remand (Tr. at 138 - 156.) and the other Dr. Khosla's January 8, 2001, Medical Assessment of Ability to do Work Related Activities (Physical) (Tr. at 315 - 318.) and the ALJ referred to them in his decision in a confusing manner. The Commissioner asserts that the ALJ nonetheless did not reject Dr. Khosla's assessment, but rather adopted it. (Document No. 21, p. 11.) Finally, The Commissioner contends that the ALJ was not required to accept Dr. Khosla's opinion on the ultimate issue of disability. (Id., p. 12.)

In his Response (Document No. 23.), Claimant disputes the Commissioner's identification of "other relevant facts" as apparent from the testimony at the 2002 and 2003 administrative hearings as allegedly indicating inconsistencies in the evidence respecting Claimant's vision and shoulder/arm limitations and a worsening of his condition. (Document No. 23.) Claimant contends that the vocational expert's conclusions were not in conformity with Claimant's limitations as Dr. Khosla and Dr. Wile found them. (Id., p. 5.) Claimant asserts that Dr. Khosla began treating him for arthritis in his shoulders in August, 2000. (Id., p. 6.) As to the Exhibit 8-F issue, Claimant states that "[i]f plaintiff was incorrect in identifying Exhibit 8-F, it merely negated one of his arguments in Section II C (Pl.'s Br., pp. 14 - 16). If the Commissioner was correct in assuming that Exhibit 8-F was the progress notes, then she failed to address the fact that those records contained the earliest medical assessment of record following an examination on August 11, 2000 (Tr. at 267 and 268.)." (Id., p.

8.)[2]

Analysis.

Claimant asserts generally that the Commissioner's final decision is not supported by substantial evidence because the ALJ erred at steps four and five of the sequential analysis. The Court will therefore examine the evidence of record to determine if the ALJ's step four and step five analysis is in compliance with applicable law and regulations and supported by substantial evidence.

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (1999); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and

---

[2] The ALJ referred to "[t]he consultative orthopedic evaluation performed on September 19, 2000" as Exhibit 5-F. (Tr. at 192.) Dr. Gary Craft's September 19, 2000, evaluation was Exhibit 5-F in the record of the case which was remanded. (Tr. at 120 - 125.) The ALJ stated that Dr. Craft's evaluation "gave some limitations of right arm motion above the head without limitations to the side but with a poor prognosis for the future." (Tr. at 192.) The ALJ then stated referring to Exhibit 8-F that "[t]reatment notes dated after the expiration of the insured status suggest much more severe orthopedic limitations; however, these notes were obtained at counsel's request (rather than because treatment was actually needed or sought) and do not have the support of the rest of the medical record (Exhibit 8-F). Accordingly, they must receive little weight as to any additional limitations prior to December 31, 2000, due to their inconsistency." (Id.) Exhibit 8-F of the record of the case before the ALJ which is under review is Dr. Khosla's January 8, 2001, Medical Assessment of Ability to do Work Related Activities (Physical). (Tr. at 315 - 318.) Dr. Khosla's Assessment was Exhibit 6-F in the record of the case which was remanded. (Tr. at 126 - 129.) Exhibit 8-F of the case which was remanded was treatment records of Bluestone Health Center from September 3, 2000, through December 13, 2001, as they were provided by Claimant's counsel under cover of her letter dated January 15, 2002. (Tr. at 138 - 155.) These documents are included among other treatment records of Bluestone Health Clinic in the record under review at Exhibit 4-F. (Tr. at 254 - 270.) The Court notes that Dr. Khosla states in his January 8, 2001, treatment note that Claimant "came in today for an examination for his lawyers. He saw Dr. Craft for Social Security, but was turned down." (Tr. at 146, 266.)

9

the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (1999). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> > (i) Your daily activities;
> >
> > (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> >
> > (iii) Precipitating and aggravating factors;
> >
> > (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> >
> > (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> >
> > (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

10

> (vii) Other factors concerning your functional limitations and restrictions due
> to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (1999). SSR 96-7p repeats the two-step regulatory

provisions:

> First, the adjudicator must consider whether there is an underlying medically
> determinable physical or mental impairment(s)--i.e., an impairment(s) that can be
> shown by medically acceptable clinical and laboratory diagnostic techniques--that
> could reasonably be expected to produce the individual's pain or other symptoms. *
> * * If there is no medically determinable physical or mental impairment(s), or if there
> is a medically determinable physical or mental impairment(s) but the impairment(s)
> could not reasonably be expected to produce the individual's pain or other symptoms,
> the symptoms cannot be found to affect the individual's ability to do basic work
> activities.

> Second, once an underlying physical or mental impairment(s) that could
> reasonably be expected to produce the individual's pain or other symptoms has been
> shown, the adjudicator must evaluate the intensity, persistence, and limiting effects
> of the individual's symptoms to determine the extent to which the symptoms limit
> the individual's ability to do basic work activities. For this purpose, whenever the
> individual's statements about the intensity, persistence, or functionally limiting
> effects of pain or other symptoms are not substantiated by objective medical
> evidence, the adjudicator must make a finding on the credibility of the individual's
> statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). Significantly, SSR 96-7p requires the adjudicator to

engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must

consider the impact of the symptoms on a claimant's ability to function along with the objective

medical and other evidence in determining whether the claimant's impairment is "severe" within the

meaning of the Regulations. A "severe" impairment is one which significantly limits the physical

or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence

of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a

11

claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2002). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§

12

404.1527(e)(2), 416.927(e)(2) (2002).

> In determining what a claimant can do despite his limitations, the SSA must consider
> the entire record, including all relevant medical and nonmedical evidence, such as a
> claimant's own statement of what he or she is able or unable to do. That is, the SSA
> need not accept only physicians' opinions. In fact, if conflicting medical evidence is
> present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The record contains documents evidencing Claimant's treatment at Bluestone Health Center

between April 26, 1999, and August 8, 2002. (Tr. at 243 - 281.) Claimant initially complained of

migraine headaches and problems with vision in his right eye. (Tr. at 280 - 281.) Claimant was found

to have high blood pressure and was prescribed medication for it. (Tr. at 275 - 278.) In May, 2000,

Dr. Khosla of the Bluestone Health Center noted Claimant's hypertension, left eye blindness,

bilateral cataracts, headaches and status post ankle surgery and prescribed Paxil for

anxiety/depression, Maxide for hypertension and an inhalant for COPD. (Tr. at 273.) Dr. Khosla saw

Claimant several times through the remainder of 2000 and changed his prescription for

anxiety/depression from Paxil to Trazadone and then to Serzone and started Claimant on Celebrex

in view of his complaints of arthritis in his shoulders and knees. (Tr. at 266 - 272.)[3] Dr. Khosla noted

on January 8, 2001, that "[p]atient obviously has limitations of activity because of arthritis." (Tr. at

---

[3] Dr. Khosla completed a West Virginia Department of Health and Human Resources
General Hysical (Adults) form on August 11, 2000, indicating that Claimant was experiencing
right shoulder pain especially on lifting his arm, Claimant could perform sedentary work but was
unable to work due to arthritis, shortness of breath and visual problems. (Tr. at 267 - 268.) Dr.
Khosla noted for the first time on September 5, 2000, that Claimant had crepitus of both
shoulders as well as knee joints. (Tr. at 270.) Crepitus is a cracking or crunching sound which
occurs when a joint moves and indicates clinically cartilage wear in the joint space or arthritis.
On January 8, 2001, Dr. Khosla found that Claimant "had tenderness of both shoulder joints with
crepitus as well as lumbar area tenderness. He also had crepitus of both knees. Gait was slow."
(Tr. at 266.)

266.) Claimant saw Dr. Khosla in February, 2001, for stomach problems. (Tr. at 265.) Dr. Khosla prescribed Ranitidine and Reglan for it and noted, as apparently Claimant reported subjectively, that "Breathing is slightly better since he has been on the inhalers. Arthritis seems to be getting better with the Celebrex also. Most of the joints hurt especially the back, ankles, knees, etc." (Id.) Dr. Khosla prescribed Darvon and then Flexeril for Claimant's joint pain through the remainder of 2001. (Tr. at 254, 262.)

Dr. Gary Craft examined Claimant on September 19, 2000. (Tr. at 120 - 125.) Dr. Craft noted Claimant's treatment at the time for hypertension, acid peptic disease and anxiety/depression disorder and Claimant's left ankle, left wrist and thumb and right heel injuries and stated that Claimant "has a chief complaint of generalized joint pain and now is taking Celebrex, 200 mg twice a day." Dr. Craft further noted that Claimant had visual acuity of 20/50 in his right eye and 20/200 in his left eye without glasses; Claimant had a full range of motion of all joints of his upper extremities and his grip strength and fine manipulation were intact; and x-rays revealed early osteoarthritis of Claimant's right shoulder and minimal obstructive pulmonary emphysema. Dr. Craft also found minimal loss of motion of Claimant's left ankle joint. His long-term prognosis for hypertension and acid peptic disease was good. His prognosis for joint complaints and anxiety/depression disorder was fair, and his prognosis for chronic obstructive pulmonary disease "would be good if [Claimant] gave up cigarette smoking."

The record further contains documents evidencing Dr. Werblin's treatment of Claimant for his vision problems between March 2, 2000, and June 25, 2002. (Tr. at 324 - 342.) It appears that Dr. Werblin performed cataract surgery on Claimant's right eye on March 1, 2000. His March 2, 2000, notes state that Claimant was doing well postoperatively and "should end up with good

14

distance vision . . . without correction, but will need glasses for reading." (Tr. at 339.) Dr. Werblin saw Claimant several times through June 29, 2000, and Claimant indicated that his vision was blurred. Dr. Werblin found that Claimant's distance vision would be better with "a small correction" and Claimant "may continue using the current reading glasses." (Tr. at 330.) Claimant saw Dr. Werblin again on June 26, 2001, and Claimant indicated that he had clouding in his eye, his distance vision was blurry and he had trouble reading. (Tr. at 326.) Dr. Werblin noted that Claimant "does not [use] glasses for distance or near". (Id.) Dr. Werblin prescribed glasses. (Tr. at 327.) Claimant saw Dr. Werblin again on June 25, 2002, and indicated that there was no change in his vision since his last visit. (Tr. at 241 - 342.) Dr. Werblin informed Claimant that sometimes a membrane will cloud causing a decrease in vision and it can be corrected with a laser procedure. (Tr. at 342.)

On January 8, 2001, Dr. Khosla prepared a Medical Assessment of Ability to do Work Related Activities (Physical). (Tr. at 315 - 318.) Dr. Khosla opined that Claimant could lift and/or carry ten pounds occasionally and frequently in an 8-hour day and noted that Claimant has shoulder and back pain and shortness of breath on minimal exertion. Dr. Khosla found that Claimant could stand and/or walk for about two hours and for about thirty minutes without interruption in an 8-hour workday. He stated that Claimant experiences back and leg pain on prolonged standing and walking. He stated that Claimant could sit for a total of six hours and for 45 minutes without interruption in an 8-hour workday. He stated further that Claimant could occasionally climb, balance, stoop, crouch, kneel and crawl; his ability to reach was affected by arthritis and his ability to push/pull and see were affected by his impairments; and he was affected in his ability to work around heights, temperature extremes chemicals dust, noise, fumes, humidity and vibration. Dr. Khosla indicated that Claimant's impairments or treatment would require Claimant to be absent from work more than three times a

15

month, and he stated that Claimant "is not able to work due to his medical condition."

Medical records of SCARH Rural Health Clinic from July 6, 2002, thorough November 11, 2002, indicate that Dr. Bahniwal examined Claimant on July 24, 2002, and Claimant "had an antalgic gait secondary to pain in the right ankle." He found that Claimant had tenderness in the lumbar area of his spine and "[r]ight shoulder examination revealed limitation of motion, flexion and extension." (Tr. at 296 - 297.) On October, 14, 2002, Dr. Chopra performed surgery on Claimant's left thumb to repair an injury to the flexor tendon. (Tr. at 302 - 305.) Dr. Bahniwal referred Claimant to Dr. Puranik, and Clamant saw Dr. Puranik in October, 2002, with "significant tenderness around the right shoulder." (Tr. at 311 - 312.) On February 19, 2003, Dr. Puranik performed surgery to repair a rotator cuff tear in Claimant's right shoulder. (Tr. at 306 - 307.)

At the June 17, 2003, administrative hearing, ALJ Kennedy asked medical expert Dr. Ira Wile whether Claimant had any severe physical limitations, and Dr. Wile stated as follows:

> I think he has a rotator cuff tear and had surgery . . .. By his testimony today . . . he's had limited improvement and has significant difficulty in extending his right arm or lifting with his right arm or anything overhead with his right arm. He's also had a laceration of a tendon to the thumb . . .. He has degenerative disk disease in the lumbar area. He has a cataract removal in the right eye with implant, and the left eye is nonfunctional from a childhood injury.

(Tr. at 360.) Dr. Wile opined in view of Claimant's testimony that he used a magnifying glass to read that "this would make it difficult for him to function in anything that he had to read instructions or * * * [f]ine work." (Tr. at 361.) Dr. Wile stated that Claimant could stand and/or walk for two hours in an eight hour day and testified that Dr. Khosla's RFC (as it was identified as Exhibit 8-F) was consistent with the evidence of record. (Tr. at 362 - 363.) The ALJ then presented the following hypothetical question to vocational expert Jean Hambrick:

> Let's take an individual the same age, education, skill level as the claimant; no
> overhead lift with the right hand; some limitation, but not significant with the left
> hand, thumb manipulation; blindness in the left eye; and no fine or reading with the
> right eye; ten pounds lift with the right arm; and stand two of eight.

(Tr. at 365.) The vocational expert responded that Claimant could perform work at the sedentary

unskilled level such as bench worker and assembler. (Id.) Claimant's attorney questioned the

vocational expert respecting Claimant's visual, sitting and standing/walking and reaching limitations.

(Tr. at 367 - 372.) The expert explained that she regarded Claimant as capable of functioning at the

sedentary level and hence able to sit for a total of six hours with the allowance that he stand/walk

occasionally though not at his leisure for a total of two hours in an eight hour workday. (Tr. at 369.)[4]

The expert indicated that a limitation upon the Claimant's ability to reach sideways with his right

arm would affect her opinion respecting Claimant's ability to perform the bench worker and

assembler jobs. (Tr. at 372.)

In his August 23, 2003, Decision, the ALJ stated as follows respecting Claimant's credibility

and residual functional capacity:

> The claimant's allegations regarding his shoulder and back pain are considered
> credible and would restrict him to a limited range of unskilled sedentary exertional
> activity, subject to a sit/stand option and various postural limitations. During the
> supplemental hearing, there was significant discussion of whether the claimant's right
> arm could reach out to the side (as opposed to reaching overhead). The claimant
> stated that he was so restricted; however, the medical records do not establish this
> limitation until after the expiration of his insured status on December 31, 2000. The
> consultative orthopedic evaluation performed on September 19, 2000, gave some
> limitations of right arm motion above the head without limitations to the side but
> with a poor prognosis for the future. Treatment notes dated after the expiration of the
> insured status suggest much more severe orthopedic limitations; however, these notes

---

[4] Ms. Hambrick testified in view of Dr. Khola's Assessment that "my interpretation of
him is he's basically got him at sedentary work. We're just looking at the sitting 45 minutes at a
time. I think . . . that would be acceptable to, to get up, not to, not to like leave for 15, 20
minutes, but just I'm assuming just stand up." (Tr. at 369.)

were obtained at counsel's request (rather than because treatment was actually needed or sought) and do not have the support of the rest of the record. Accordingly, they must receive little weight as to any additional limitations prior to December 31, 2000, due to their inconsistency.

Similarly, his visual limitations appear slightly exaggerated. He is legally blind in his left eye, but his right eye permits significantly greater visual acuity than he is willing to admit. Subsequent to the supplemental hearing, he submitted several additional records from his treating eye doctor. These new records show that the claimant has uncorrected visual acuity (in the right eye) of 20/50 and could obtain even greater correction with the use of a simple lens (as opposed to a powerful magnifying glass as suggested by the testimony at the supplemental hearing.)

Accordingly, the undersigned finds the claimant retains the residual functional capacity to perform unskilled sedentary exertional activity, subject to limited visual acuity; limited reaching with the right arm; and various postural and respiratory limitations. These postural limitations would restrict the frequency of bending, stooping, squatting, crawling, kneeling, and crouching. These respiratory limitations would restrict the claimant from working around fumes, dust, high humidity, or stale air.

(Tr. at 192 - 193 (Citations to record omitted.).

The Court can find no error in the ALJ's step four and step five analysis. Claimant filed his application for DIB on August 15, 2000, about four and a half months before his insured status for disability lapsed on December 25, 2000. Claimant had the burden of proving through the submission of substantial medical evidence that he had severe impairments resulting in limitations which precluded him from performing his past relevant work prior to the expiration of his insured status. Belcher v. Apfel, 56 F.Supp.2d 662, 666 - 667 (S.D.W.Va. 1999). First, respecting Claimant's residual functional capacity, the ALJ found that Claimant had  severe impairments including degenerative joint disease resulting in certain limitations included limited reaching with the right arm which prevented him from performing his past relevant work. The ALJ specified, however, that the record supported the finding that Claimant was limited only in his ability to reach overhead with his

18

right arm. The ALJ did not find any indication in the record that Claimant was limited in his ability to reach to the side while Claimant had insured status. While Dr. Khosla began treating claimant for arthritis before Claimant's insured status lapsed, Dr. Craft noted on September 19, 2000, that Claimant had full range of motion of his upper extremities. The ALJ's findings are clearly consistent with the evidence of record. Second, respecting Claimant's credibility, the ALJ deemed Claimant's testimony respecting his shoulder and arm limitations credible but found his indication that his visual acuity was so poor that he needed to use a magnifying glass to read a "slight exaggeration" in view of Dr. Werblin's indication that Claimant's vision could be improved with corrective glasses. The Court finds that the ALJ's findings and conclusions in this regard are consistent with and supported by substantial evidence of record. The Court notes further that the ALJ gave due consideration to Claimant's visual limitations in fashioning his RFC and stating his hypothetical question for the vocational expert by determining that Claimant could not perform fine work or reading. Finally, the Court finds that the ALJ did not reject Dr. Khosla's assessment as Dr. Wile found it consistent with the evidence. The ALJ adopted Dr. Khosla's findings and presented his hypothetical question consistently with them. The vocational expert responded that there were jobs in the national economy which Claimant could perform but indicated that, had the evidence supported a finding that Claimant was limited in his ability to reach to the side while he had insured status, it would have affected his ability to perform the jobs which she found he could do at the unskilled sedentary level. The Court finds that the ALJ's hypothetical question was fashioned in conformity with the evidence of Claimant's limitations as they existed before and after his insured status expired, and the vocational expert adequately expressed her opinions in view of the ALJ's hypothetical question and Claimant's attorney's inquiries in modification of it.

Having carefully examined the record, the Court finds that the ALJ's analysis is consistent with applicable law and regulations, his findings are correct and his conclusions respecting Claimant's RFC are supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion to Consolidate this action with Civil Action No. 1:02-0473 is **DENIED** (Document No. 13.), Plaintiff's Motion for Judgment on the Pleadings (Document No. 14.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 20.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: April 29, 2005.

R. Clarke VanDervort
United States Magistrate Judge

20